KAMALA D. HARRIS
Attorney General of California
JEFFREY R. VINCENT
Supervising Deputy Attorney General
ROHIT KODICAL
Deputy Attorney General
State Bar No. 215497
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA  94612-0550
  Telephone:  (510) 622-2226
  Fax:  (510) 622-2121
  E-mail:  Rohit.Kodical@doj.ca.gov
*Attorneys for Defendant Joe Lafauci*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JAMES LIGON,**<br><br>                                  Plaintiff,<br><br>v.<br><br>**JOE LAFAUCI,**<br><br>                                  Defendant. | 5:13-CV-02875 RMW<br><br>**DEFENDANT'S TRIAL BRIEF**<br><br>Date:           January 15, 2015<br>Time:          2:00 p.m.<br>Courtroom:  6<br>Judge:         Hon. Ronald Whyte<br>Trial Date:    February 2, 2015<br>Action Filed: June 21, 2013 |

## INTRODUCTION

This civil rights and personal injury lawsuit arises from the June 21, 2012 shooting of plaintiff James Ligon by Defendant Joe Lafauci, an officer with the California Highway Patrol ("CHP"). The shooting followed an attempted enforcement stop for speeding; a pursuit on the freeway, commercial and residential areas; and an altercation between Plaintiff and Defendant. Plaintiff alleges violation of his civil rights pursuant to 42.U.S.C. § 1983, and state law claims for negligence, assault and battery and intentional infliction of emotional distress. Defendant Lafauci contends his actions were justified based on the circumstances. After the pursuit, plaintiff James Ligon got out of his car without being instructed to do so. Within two seconds, he charged

directly at Officer Lafauci while yelling threats and refusing Lafauci's commands to "stop", "show your hands" put his hands up and "get down."

## STATEMENT OF FACTS

On June 21, 2012, CHP Officers Joe Lafauci and Cory Walczak were conducting traffic enforcement on southbound Highway 101 near University Avenue in Palo Alto, CA. At approximately 1:18 a.m., they clocked plaintiff James Ligon driving over 80 MPH in his Toyota Corolla. Officer Lafauci caught up to Ligon north of the San Antonio Road exit and initiated the traffic enforcement stop using his solid red lights. Mr. Ligon went to the right lane, but did not stop. Officer Walczak used the public address system ("P.A.") to direct Ligon to take the exit at Rengstorff Ave., but Ligon ignored the instruction. Officer Lafauci positioned his car to the driver's side of Ligon's car so that Ligon could better hear the P.A. Ligon continued to refuse instructions to take the next four exits -- Shoreline Blvd., Highway 85, Moffett Blvd, and Ellis St.

As they crossed over Ellis Street (3 miles after turning on the forward red light), Officer Lafauci pulled directly behind Mr. Ligon and initiated his Code 3 siren and flashing blue and red emergency lights. Ligon drove 65 to 70 MPH for another 1.2 miles before exiting at Mathilda Ave. Ligon immediately crossed the four lanes of Mathilda and turned left on Ahwanee Ave. He made a right turn into a Denny's parking lot, cut through the lot and passed the adjacent motel. Ligon proceeded to exit the lot and turned left onto San Aleso Ave., a commercial and residential street behind the motel. Ligon then reconnected with Ahwanee Ave., ran two stop signs, and turned right onto Alturas Ave. A few seconds later, Ligon abruptly pulled into a red zone with fire hydrant near 277 Alturas Ave. The officers were close behind with their Code 3 lights and siren.

Due to Mr. Ligon's abrupt stop on Alturas, Officer Lafauci stopped about 20 feet behind Ligon (rather than the 30 feet trained by CHP). Based on Ligon's evasive actions and failure to yield, the officers prepared for a high risk stop as outlined in the Highway Patrol Manual. Officer Lafauci got out of the driver's side door and drew his gun. Officer Walczak got out with radio in hand ready to instruct Ligon, but Ligon got out of his car as soon as he pulled over so Walczak threw the radio to his seat. Officer Walczak did not draw his firearm as he was preparing to chase

2

1   Ligon on foot. Walczak prepared to draw his Taser.

2         Within two seconds of getting out of his car, Ligon moved diagonally towards the middle of the street with his hands in front of him near his waistband and charged directly at Officer Lafauci. Officer Walczak testified that Ligon's movement was like a "quick sprint." Officer Lafauci, who had his gun drawn, immediately commanded Ligon to stop, "get down", "show his hands", and put his hands up. Ligon ignored the instructions, and continued to charge Officer Lafauci (while making a football style "juking" movement), and yelled that he was "running at" and "coming to get" Lafauci.

      Officer Lafauci retreated towards the back of his car while yelling the same commands at Ligon. Ligon refused to stop, get down or show his hands and continued charging. Officer Lafauci felt that he could not risk the possibility that Ligon had a gun or other weapon. Nor could he risk getting tackled and losing his gun, or having a fight for his gun. When Ligon was within 10 to 15 feet, Officer Lafauci knew that he could not transition from his gun to a non-lethal weapon. Officer Lafauci continued to step backwards towards the rear of the patrol unit and fired at Ligon. Lafauci fired twelve shots, hitting Ligon eight times.

      Ligon was taken to the hospital where his blood alcohol concentration ("BAC") was measured at 0.319%. His BAC was measured again by the Sunnyvale Police Department following a blood draw at 8:15 a.m. Ligon's BAC was 0.12% seven hours after the pursuit and shooting. Based on the rate of metabolism and fluid replacement following surgery, Ligon's BAC was at least 0.24%, but likely closer to 0.30% at the time of the incident. Ligon pled no contest to (1) felony evasion under California Vehicle Code section 2800.2(a); and (2) misdemeanor violation of California Vehicle Code section 23152(b) – DUI with BAC of 0.08%. In exchange for the plea, the Santa Clara County DA dropped the charge of violating Penal Code section 69 – using threats or violence to resist arrest or prevent an officer from performing his duties. Both the Sunnyvale Police and Santa Clara County DA found Officer Lafauci's use of force justified under the circumstances.

# POINTS OF LAW

## A. LEGAL STANDARD IN EXCESSIVE FORCE CASES

Claims of deadly excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment. The reasonableness of a particular use of force is judged "from the perspective of a reasonable officer on the scene," and "in light of the facts and circumstances confronting [him]." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The Supreme Court has held that it is unreasonable to "seize an unarmed, non-dangerous suspect by shooting him." *Id.* The Fourth Amendment prohibits police from using lethal force against a suspect who "poses no immediate threat to the officer and no threat to others. . . ." *Tennessee v. Garner,* 471 U.S. 1, 11, (1985). "[W]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Garner,* 471 U.S. at 11.

However, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others, it is not constitutionally unreasonable" to use deadly force. *Id.* The courts analyze the facts bearing on the threat posed with particular attention to "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he . . . actively resist[ed] arrest or attempt[ed] to evade arrest by flight." *Graham,* 490 U.S. at 396. In addition, the courts recognize that "police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving . . . ." *Billington v. Smith,* 292 F.3d 1177, 1184 (9th Cir. 2002) (quoting *Graham,* 490 U.S. at 396). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396.

These legal principles are reflected in the Ninth Circuit Model jury instruction (9.22), which states:

> Under the Fourth Amendment, a police officer may only use such force as is "objectively reasonable" under all of the circumstances. In other words, you must judge the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene and not with the 20/20 vision of hindsight.

In determining whether the officer used excessive force in this case, consider all of the circumstances known to the officers on the scene, including:

> 1. The severity of the crime or other circumstances to which the officers were responding;
>
> 2. Whether the plaintiff posed an immediate threat to the safety of the officers or to others;
>
> 3. Whether the plaintiff was actively resisting arrest or attempting to evade arrest by flight;
>
> 4. The amount of time and any changing circumstances during which the officer had to determine the type and amount of force that appeared to be necessary;
>
> 5. The type and amount of force used;
>
> 6. The availability of alternative methods to subdue the plaintiff

### B. OFFICER LAFAUCI'S ACTIONS WERE OBJECTIVELY REASONABLE

Applying the relevant case law and elements of the Model Jury Instruction, Officer Lafauci's actions were objectively reasonable.

#### 1. Severity of the Crime

Mr. Ligon admits that he drove in a willful or wanton disregard for the safety of persons when he attempted to evade the officers. He pled no contest to felony evasion and DUI. Ligon risked the lives of drivers on the freeway and streets of Sunnyvale, as well as patrons at the Denny's and guests at the motel. Ligon's actions made the officers think that he had a reason to run; something more than just the speeding infraction that started the pursuit. The officers are trained (and statistics show) that suspects that flee are usually wanted for serious misdemeanors or felonies. Ligon continued to raise suspicion and risk lives when he ran multiple stop signs in his own neighborhood around Ahwanee Ave.

#### 2. Immediate Threat to Officer Safety / Resisting Arrest

Mr. Ligon abruptly pulled into a red zone on Alturas Ave. causing Officer Lafauci to stop his vehicle approximately 20 feet from the rear of Ligon's car. Officer Lafauci drew his gun based on his "high risk stop" training, and because he could not risk the possibility that Ligon was armed. Ligon elevated the threat level by getting out of his car and yelling at Lafauci. Officer Lafauci instructed Ligon multiple times to "stop", "show his hands" and "put his hands up."

5

Lafauci and Walczak each testified that Ligon charged directly at Lafauci within a few seconds of exiting his car.

Percipient witness Brian Van Dyck was on his driveway about 100 feet away from the rear passenger side corner of the CHP car when the incident occurred. He testified that Ligon's hands were "down and in front of him" and that Ligon was "rapidly shuffling" and "running" in the direction of the SUV parked across from Officer Lafauci when the shots were fired. Based on Van Dyck's vantage point, and given the width of the street and relative positions of the CHP unit and SUV across the street, Van Dyck's testimony supports the officers' description of Ligon's path to Lafauci. Also, the fact that Lafauci had to yell his commands multiple times shows that Ligon was not complying.

### 3. Time and Circumstances Affecting Force Decision / Alternatives Available

According to every witness, this incident unfolded in a matter of seconds. It was well past 1:00 a.m. and most of the street lighting was obscured by trees. Ligon pulled over to the curb and the officers parked 20 feet behind him. The officers were barely out of the car when Ligon got out of his car. It was so fast that Walczak did not have time to use the P.A. to give Ligon instructions. Walczak threw his radio down, began to draw his Taser and prepared for a foot chase. Within seconds of getting out, Ligon yelled and then charged Lafauci from about 20 feet away with his hands near his waistband. POST teaches the officers that concealed weapons are often kept in the waistband and based on his clothing, there was no other place for him to keep a weapon.

Mr. Ligon ignored Lafauci's commands to stop. Lafauci could not risk the possibility that Ligon had a gun or other weapon. Also, he could not risk getting tackled by Ligon, getting in a fight and losing his gun. Finally, based on Ligon's proximity and closing speed, Officer Lafauci knew that he could not transition from his gun to his Taser or other non-lethal weapon. Due to the threat posed by Mr. Ligon charging at him with his hands near his waistband, Officer Lafauci fired his weapon.

### 4. Arguments Regarding Alleged "Failure to Warn"

Plaintiff focuses on Lafauci's "failure" to give a warning that he was about to shoot; or switch from the firearm to a non-deadly weapon available to him: baton, Taser, or pepper spray.

POST requires a warning "if feasible" while Ninth Circuit cases state that a warning must be given "whenever practicable" *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997), and "when giving such a warning is plausible." *Mattos v. Agarano,* 661 F.3d 433, 451 (9th Cir. 2011). While it is true that "the totality of the circumstances" includes "the availability of less intrusive alternatives to the force employed" and "whether proper warnings were given," *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010), those alternatives have to be available. Ligon charged Officer Lafauci from fifteen feet away, thus it would be reasonable to focus on Mr. Ligon's hands first, rather than the warning.

Also, the Ninth Circuit has dispensed with the "least intrusive alternative" requirement where there are exigent circumstances, because it "requires them to exercise superhuman judgment":

> In the heat of battle with lives potentially in the balance, an officer would not be able to rely on training and common sense to decide what would best accomplish his mission. Instead, he would need to ascertain the least intrusive alternative (an inherently subjective determination) and choose that option and that option only. Imposing such a requirement would inevitably induce tentativeness by officers, and thus deter police from protecting the public and themselves. It would also entangle the courts in endless second-guessing of police decisions made under stress and subject to the exigencies of the moment. Officers thus need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable.

*Scott v. Henrich,* 39 F.3d 912 (9th Cir. 1994).

The jury should apply these principles to Officer Lafauci's split-second decision to fire. The circumstances indicate that he had just a few seconds while Ligon closed the distance between them.

### C.  OFFICER LAFAUCI IS ENTITLED TO QUALIFIED IMMUNITY

Qualified immunity serves to shield government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In ruling on a qualified immunity defense, a court must consider two questions. First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Second, an inquiry into whether the plaintiff alleges a deprivation of a constitutional right and was that right clearly established. *Saucier v. Katz*, 533 U.S. at 201, 121 S.Ct. 2151; *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir.2002). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151.

Law enforcement officers are entitled to qualified immunity if they act reasonably under the circumstances, even if the actions result in a constitutional violation. *Ramirez v. Butte–Silver Bow County*, 298 F.3d 1022, 1027 (9th Cir.2002), cert. denied, 298 F.3d 1022 (9th Cir.2002). The Supreme Court recognizes that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present." *Anderson v. Creighton*, 483 U.S. at 639. Put another way, the qualified immunity standard gives room for mistaken judgment and protects all but the plainly incompetent or those who knowingly violate the law. *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

Defendant Joe Lafauci is protected from plaintiff's §1983 claims by the doctrine of qualified immunity. Based on the Ninth Circuit Model Instructions and *Graham v. Connor*, 490 U.S. 386, Officer Lafauci's actions were objectively reasonable. After failing to pull over as directed, Mr. Ligon led the officers to a dark side street unfamiliar to the officers. He made an abrupt stop and got out of his car without being instructed. When Officer Lafauci stopped behind Ligon, he got out of the car and drew his gun in compliance with "High Risk Stop" procedures taught by CHP and POST. Mr. Ligon yelled threats, refused Lafauci's commands to put up his hands, and within a few seconds of getting out of his car, charged directly at Lafauci at a speed that gave Lafauci less than two seconds to decide whether to shoot. Based on the totality of the

circumstances, it was reasonable for Officer Lafauci to think that James Ligon posed a risk of serious physical harm.

Dated: January 2, 2015

Respectfully Submitted,

KAMALA D. HARRIS
Attorney General of California
JEFFREY R. VINCENT
Supervising Deputy Attorney General

*/s/ Rohit Kodical*

ROHIT KODICAL
Deputy Attorney General
*Attorneys for Defendant Joe Lafauci*